We'll hear the next case, United States v. Ronald Tarrant. Good morning. Good morning, Judge Carney, Judge Chinn, and Judge Kogan. My name is Kelly Sharkey, and I represent Mr. Herron on this appeal. There were four points that were briefed. The fourth point, I believe, in this circuit was addressed by the held decision, so I will not be addressing that today, although we're not abandoning the claim. Your Honors, I would like to start with my first point and note that during the trial of Mr. Herron's case, the trial court, Judge Garifas, granted defense witnesses the right to invoke the fifth without an adequate inquiry and without a specific inquiry. The factual nature of this is laid out in the brief, but in short, the government filed a short letter after receiving the defense of the public record for all of the witnesses that were noted in the letter. That's in the government appendix. What followed was the assignment of counsel for each of the potential witnesses and a wholesale grant of the witnesses' rights to invoke the fifth without . . . How many were there in the group? I believe there were five, and I'm sure Mr. Arrio, who was trial counsel, will correct me if I'm wrong. They are listed, though, in the government appendix. Perhaps there were six. Why aren't we hearing on Flowers at all? If Flowers was withdrawn from the defense? Because, Judge, I think Flowers is particularly interesting and was included in the brief because Flowers had a relationship with Mr. Herron. Flowers had initially indicated that she would testify without a subpoena. When I say relationship, a family relationship with Mr. Herron, she would testify without a subpoena, and trial counsel represented to the court that she may invoke the fifth on certain issues. But Flowers also intersects with the cell site argument, which is the third point, because the cell site places Herron in the vicinity of Flowers' home and also where he lives and also where the murder occurred. To get back to my original point, however, the court granted a wholesale allowance of all these witnesses to invoke the fifth. Even if we were to agree with you that it's not best practice, certainly it may be a problem to have done so, what testimony would Stacey Knight have provided that wouldn't have been duplicative? What kind of evidence would have been adduced that would have affected the proceedings in any way at all? I think, Judge, at the time of a trial with an individual like Stacey Flowers, who had done substantial— Stacey Knight. Oh, thank you. I do that all the time. Stacey Knight, who had done a substantial amount of jail time, was spoken about by numerous prosecution witnesses, but nonetheless was willing to come forward and not only discuss Mr. Herron's activities in the rap industry, but also would talk about how being a blood was not necessarily the equivalent of being a criminal. That was a duplicative of testimony offered by other witnesses? I don't think the other witnesses would have been as good, and I thought the other witnesses were certainly less credible than Mr. Knight would have been based on the government's allegations against him. Quality, not the substance? Yes. And I think that the trial counsel were bold. I think the trial counsel had a hard case, and they pushed back really hard. And they put on witnesses that many counsel would have questioned putting on. But, I mean, in retrospect, I think it was the right thing to do. I don't think they had any choice. And I think that by limiting the ability of counsel to come to the most fundamental of rights, the right to compulsory process, the right to put a defense on, that Judge Garifas regretfully made a mistake here. You would have to find that that mistake was not harmless error in light of a long roster of witnesses in the government's case, right? Understood, Judge. And I think that because of the constitutional nature of the violation, that it shouldn't be reviewed as harmless error. I think it's the type of case that's described in Nieder and Fulamente that permeates the rest of the trial, that is so fundamental, the right of an accused individual to bring witnesses forward on their own behalf. Most cases you review, defense counsel calls no one. These lawyers were swinging for the fences. And the court should not have precluded them from— They were swinging for the fences because the evidence was pretty strong. I don't disagree with you, Judge. But, you know, tough cases sometimes make bad law. I don't think I finished Judge Carney's—answering Judge Carney. You're short on time, so I feel like you've addressed my question. Okay. I'm sorry, Judge Chin. Forgive me. I was just going to—on this issue, while the trial court might have moved a little bit quickly, eventually he did inquire of both Flowers and Knight. But, Judge, on the decision as to Knight, respectfully, and it's laid out in the brief, I think Judge Garifus made up his mind and then allowed trial counsel to make a record as to the questions he would ask. Judge Garifus was frustrated by the measuring or the balancing process between the witnesses' Fifth Amendment rights and the defendant's Sixth Amendment right, and never engaged in that critical evaluation. And just to touch real briefly, because I'm running out of time like crazy, it's not—even if you engage in a harmless error analysis, it's not harmless in this case. The nature of the quality of the evidence in this case is primarily cooperator. And the different areas that were affected by Judge Garifus' ruling here and in the wholesale allowance of the rap videos and in the introduction of the cell site testimony all bolstered a very, very weak case. Because here there were not eyewitnesses in the Zapata murder, the Brooks murder. The witnesses were full of contradictions. And the Russo murder, similarly, was weak. So, respectfully, the Court's rulings on the three issues—and it was a very lengthy, dense trial—but on the three issues that were briefed—and I encourage you to go back to the brief, because I'm out of time—denied the defendant a right to a fair trial, denied the defendant a right to present witnesses, implicated his Fourth Amendment rights in the case, and I think I should stop unless I am granted more time. You have some rebuttal time, sir. Okay. Thank you. My name is Shreve Ariel, and I'm here on behalf of the appellee of the United States. And as counsel pointed out, I was trial counsel in U.S. v. Ronald Caron with my colleagues who are here today. Obviously, we'll put aside the Johnson issue, as it has been resolved, and the two areas that I'll focus on are the Sixth Amendment issues and the 403 issues with respect to the videos. And Your Honor— I hope you'll address the cell site information, too. I certainly will, Your Honor, if briefly, if that's all right. With respect to the Sixth Amendment issue, with respect to Diane Flowers, the Court is to subpoena her as a witness, and thus, today, can't come before this Court and complain about the fact that she was not present as a witness in the Court. Nonetheless, at the trial, the Court conducted a very careful analysis of the witnesses' invocation of the Fifth Amendment. In this case, it's also notable the context in which her potential testimony was to be the vast majority of the government's case, and during that case, one cooperating witness, Rafael Gonzalez, had specifically implicated her as an accessory after the fact of the murder of Richard Russo, that she had actually gotten rid of one of the firearms. And then another piece of evidence, a stipulation related to a car accident, corroborated her involvement in that obstruction after the fact.  Another cooperating witness identified her as a person who had stored and transferred firearms for Heron's organization, and as counsel pointed out, sell-cite also implicated her potentially as an accessory related to the Victor Zapata homicide. Ronald Heron essentially fled from the Wyckoff houses after the Zapata homicide to an area within the vicinity of her home, just as he had previously done on the Russo homicide. So there, the liability, I think, is extraordinarily clear, and specifically, counsel represented that he intended to ask her about these two events, whether or not she got a firearm from Rafael Gonzalez, and whether or not she had received firearms. So I think in terms of the proffered questions that defense counsel is seeking to ask, there's absolutely no question that she would have put herself in jeopardy, and it was an entirely appropriate opportunity for her to invoke her Fifth Amendment rights. With respect to Stacey Knight, counsel did persist in terms of attempting to call Stacey Knight as a witness. And it's notable, though, again, in the context here, who we're talking about, because Stacey Knight is an individual who's also known as Soul B. Soul B was, at the time, throughout the time period of the charged conduct, a godfather or a high-ranking member of the murderous mad dog set of the Bloods. That is the exact same set of the Bloods that Ronald Heron and his crew members were a part of. And so it is significant that defense counsel in this case proffered that he intended to the nature of that organization, in an effort to say or to suggest or argue that it was not a criminal organization, but was somehow a beneficial organization. So there also, in the context of prior testimony and evidence, there was substantial testimony by cooperators about Knight's rank within the Bloods above Heron. There was documentary evidence revealing their prohibited correspondence about the operation of the gang while Ronald Heron was in prison. And specifically with respect to some of the videos in question, Ronald Heron in Project Music 3, Part 1, specifically referenced his time in prison with Soul B as being a significant part of his credentials as a murderous mad dog Bloods, that he had a relationship with him. Other indications in terms of documentary proof showed that during the course of the trial, the crew went to visit Stacey Knight, Soul B, in prison, and there were actually visit records that were introduced at trial that showed that continued relationship after Heron had been released from prison. So in that context, counsel indicated that he intended to adduce testimony from Mr. Knight that he was a member of the Bloods and that he was, that the Bloods was somehow a non-criminal organization. Just admitting his relationship with Ronald Heron and his involvement in the Bloods would have likely have subjected him to potential criminality, given- A non-criminal organization might have subjected him to a perjury charge. That I think is correct, Your Honor. And so I think there, given that the relationship between Knight and Heron was so inextricably tied together with the relationship within the organization, it would be hardly possible for him to actually testify without inculpating himself. And as Your Honor points out- What about as to these other matters, the quality of his musical career and that he would be particularly persuasive and have a different quality of testimony? With respect to the testimony or potential testimony about this idea that he had changed his life or was going in a different direction, that testimony would have only been related to their relationship while they were in jail together, essentially. So everything about his testimony would have been tied together with his membership in the Bloods, and he would have ultimately stumbled into that within about two seconds of opening his mouth. That how do you know Ronald Heron? Well, we're in the Bloods together. Tell me about his music career. What you're talking about is what Judge Gariffas would have found had he conducted a very detailed inquiry about the nature of the Crawford testimony and the Fifth Amendment claim. Is that what you're doing right now? I think Defense Counsel Crawford the testimony and he invoked, and in the context of the record as it stood at the time that I laid out before, I don't think any additional inquiry was necessary given how significant he was actually in the organization. And additionally, as Your Honor points out, there were a number of other witnesses who testified for the defense, and I think that is an important fact. This wasn't a trial where Mr. Heron did not present a defense. He presented a robust and strong and complex defense he called Jonathan Rice, who spent time in jail with him, to testify about the Bloods, and Mr. Rice suggested in some ways that this organization was not a criminal organization. He called Shondell Walker, who was a right-hand man or a gunman for Ronald Heron, who testified that he had joined the Bloods as a fashion and suggested that it was not a criminal organization. And he called Leonard Grant to testify in detail, Uncle Murder is Leonard Grant, to testify in detail of Ronald Heron's rap career. And again, on that point, that is ultimately one of the significant things about the government's case is, and I'll turn here at least to the 403 analysis, is this was not a case about rap or music. I think we made it very clear to the jury and to the court that our entire case was about the evidence that we offered in the case, the tremendous amounts of evidence. And counsel for the appellant dismisses the overwhelming nature of the evidence in this case, but it was replete with the testimony of civilian witnesses, seizures, there was an undercover, a massive undercover buy operation that went on, there were records that were seized from the jail from Heron, there were seizures of guns, of crack, all sorts of things that went on. And also relied heavily on the cell site information. And maybe you could just right now address what the government's position is, whether because it is produced by a third party, the government need make any showing, or whether it needs to make the 2703D showing, or whether in some circumstances, for example, for extended monitoring through cell site information, a warrant might be required. I know you're taking the good faith and unity position right now, but I wondered what the government's position is generally. Certainly, Your Honor, and I don't speak for the entire government, obviously here, but in our case, as we pointed out, the circuit has not addressed this issue, and I think at this time, it's totally appropriate for the government to proceed as it did then, under a 2703D order to obtain cell site information, as it is a third party provider issue under Nonetheless, in this case, obviously... So 2703D, getting that order, protects you against a Fourth Amendment privacy claim? Yes, I think that's correct, Your Honor. If I understood your question, I'm not sure if I did or not. I just would point out for the court, there was one subsequent decision that's relevant in the circuit, U.S. v. Caraballo, 2016, W.L. 407-3248, from the circuit, and there was also a Sixth Circuit decision that we didn't cite that was recent, United States v. Carpenter, 819F3-880. That also did not address the issue of the Fourth Amendment's application. Thank you. Thank you. We'll hear the rebuttal. Thank you, Judge. I'd like to say just a few things. As to the issue with flowers and night and the granting of the privilege without an inquiry, Judge Garifuss flatly refused to consider whether or not a witness would invoke on some questions and not other questions. The record shows that trial counsel anticipated that, in fact, the witnesses might invoke on some questions. And I'll quote the judge, the court has no intention of parsing whether the Fifth Amendment applies to their questions, referring to the government as opposed to your questions. Transcript 3244. So with all due respect, the court did not engage in a necessary inquiry here. Wasn't it pretty apparent from the circumstances that Knight would be putting himself in jeopardy by testifying about the MMDB and the various activities and his relationships with Huron? But Knight was not indicted. The government had a lengthy investigation on this. The case was superseded over two years. I think the concern is by testifying and admitting to certain things, might he then subject himself to indictment? It depended on which questions he answered. But, yes, of course. But Knight willingly came to court. And respectfully, I don't fault the prosecutors for identifying a potential Fifth Amendment issue. If Judge Garifas had done a more searching inquiry, would he have reached any different conclusion? I think if Judge – I'm sorry, Judge? I go through a futile gesture. That's the question. Well, A, I don't agree that it's futile. And jury decisions, as all of you judges well know, hinge on sometimes the oddest thing or the impression that a jury, a juror, might have as to a particular witness. And I don't think that, in fact, if the court had gone through the inquiry and allowed, actually, the witnesses to invoke on certain questions and not on others, which is allowed and is the preferred practice, but wasn't even given a shot here. Thank you. Thank you. I'm sorry I ran out of time.